USDC SCAN INDEX SHEET

R1R 9/7/05 8:33

3:04-CV-00658 CORNWELL V. BELTON

*108*

*MEMOPNO.*

FILED

05 SEP -6 PM 2:59

CLERK, U.S. DISTRICT COURT

BY: DEPUTY

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JOANNE CORNWELL, d/b/a SISTERLOCKS,<br>Plaintiff,<br>vs.<br>DEBRA BELTON, as an individual, NAPPYLOCS.COM, as a business entity, form unknown, and DOES 1 through 50, inclusive,<br>Defendants. | CASE NO. 04-CV-658 H (BLM)<br>**Amended Memorandum Decision** |

On April 1, 2004, Plaintiff JoAnne Cornwell, d/b/a Sisterlocks, filed a complaint before this Court against Defendant Debra Belton, d/b/a Nappylocs.com ("Ms. Belton" or "Nappylocs"). In her complaint, Plaintiff alleged trademark infringement, violations of the Uniform Trade Secrets Act, unfair competition, interference with economic advantage, and copyright infringement. The parties elected a bench trial that commenced July 26, 2005 and concluded on July 29, 2005. (04-CV-658 H, Doc. No. 101.) Gregory Garrison appeared on behalf of the Plaintiff, Dr. Cornwell. Ms. Belton appeared *pro se*.

Having carefully considered the evidence presented at trial, the credibility and demeanor of the witnesses, the arguments made by the parties, and the relevant legal standards, the Court finds in favor of the Defendant on the claims of trademark

infringement, violations of the Uniform Trade Secret Act, unfair competition, and interference with economic advantage. On the copyright claims, the Court finds in part in favor of the Plaintiff and in part in favor of the Defendant.

By separate order, the Court issues an injunction that precludes Defendant from publishing (1) the graphic showing the various block sizes presently shown on page 7 of her 2004 book and page 8 of her 2002 book; and (2) the description and pictures of the four-point pattern presently depicted on page 20 of the 2004 book and page 18 of the 2002 book. This injunction shall not be construed to prevent Defendant from publishing in the future a Nappylocs book appropriately modified to remove these two items.

The Court turns first to Plaintiff's claim of trademark and trade dress infringement.

**1. Trademark and Trade Dress Infringement**

As to each of the causes of action, this case involves methods of natural hair care. "Natural hair care" is the use of natural materials or natural means to "style" or "form" one's hair without chemical alteration. (Pl. Mem. of Contentions of Fact & Law ("Pl. Mem."), ¶ 2.) Within the African-American community, there have historically been several techniques of natural hair care: weaving, braiding, afro, sculpting, and locking. (Id. ¶ 1.) Plaintiff contends that she developed a method of preparing thin hair "locks" by sectioning the hair and "locking" the hair in those sections through certain looping patterns in the early 1990s. (Id. ¶ 4.) Through her Sisterlocks business, Dr. Cornwell trains others in her technique and markets hair care products. Dr. Cornwell trademarked the name "Sisterlocks." (Pl. Ex. 16.) Dr. Cornwell also has registered for copyright for her workbooks and training videos. (Pl. Exs. 13-15.)

The Defendant, Debra Belton, sells hair care products and hair jewelry through

her internet business, Nappy and Happy.[1] In 2000, Ms. Belton took a Sisterlocks course. In the fall of 2001, upon the request of a client, Ms. Belton developed a different locking technique to create thicker locks that she called "Nappylocs." Subsequently, in 2002, Ms. Belton self-published an instructional book for her technique entitled "Creating and Maintaining Dreadlocks Using a Tool: The Nappylocs Approach" ("Nappylocs book"). Ms. Belton sold this book and her Nappylocs tool on her two webpages: www.nappyandhappy.com and www.nappylocs.com. Plaintiff contends that Defendant's activities violate her trademark rights, and the Defendant disputes this claim.

A. Trademark Infringement

A trademark is a "word, name, symbol, or device" used by an individual to "identify and distinguish his or her goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods . . . ." 15 U.S.C. § 1127 (2000). A trademark holder may bring an action for infringement to prevent or recover for the unauthorized use of his or her mark. Id. § 1114. In the Ninth Circuit, an analysis of trademark infringement turns on whether the "reasonably prudent consumer" is likely to be confused "as to the origin of the good or service bearing one of the marks." Dreamwerks Prod. Group, Inc. v. SKG Studio, 142 F.3d 1127, 1129 (9th Cir. 1998).

In AMF, Inc. v. Sleekcraft Boats, 599 F.2d 341, 348-49 (9th Cir. 1979), the Ninth Circuit articulated eight factors for likelihood of confusion: "1. strength of the mark; 2. proximity of the goods; 3. similarity of the marks; 4. evidence of actual confusion; 5. marketing channels used; 6. type of goods and the degree of care likely to be exercised by the purchaser; 7. defendant's intent in selecting the mark; and 8. likelihood of expansion of the product lines." "This eight factor test is pliant, and the relative import of each factor is case specific." Interstellar Starship Servs. v. Epix, Inc., 304 F.3d 936, 942 (9th Cir. 2002). There is "no mechanistic formula or list [that] can

[1] The evidence at trial was that Nappylocs.com is a d/b/a of Debra Belton. Accordingly, the Court does not treat it as a separate Defendant.

set forth in advance the variety of elements that comprise the market context from which likelihood of confusion must be determined." Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc., 109 F.3d 1394, 1404 (9th Cir. 1997) (internal citation and quotation

////

marks omitted). In general, the factors should not be "rigidly weighed; we do not count beans." Dreamwerks, 142 F.3d at 1129.

The Court begins with similarity of the marks. Sleekcraft, 599 F.2d at 348. "Sisterlocks" and "Nappylocs" are strikingly dissimilar in sound, appearance, and connotation. According to the testimony at trial, "nappy" refers to kinky or extremely curly hair, whereas "sister" refers to either a female sibling or, within the African-American community, an African-American woman. The two names share a root term, "locks," that Dr. Cornwell does not contend she can monopolize. The evidence at trial indicated that within the hair industry, there are numerous styles that incorporate the term "locks" including, for example, dreadlocks, latch locks, and stitch locks. There was no evidence in the record of confusion from these common usages of "locks." Because "sister" and "nappy" are entirely distinct, similarity of the marks does not favor the Plaintiff.

Plaintiff also failed to show that Defendant chose her "Nappylocs" mark for an improper reason. At trial, Ms. Belton credibly testified that she chose the "Nappylocs" mark to match her existing business name, "Nappy and Happy." In addition, the testimony and evidence showed that Sisterlocks trainees are expressly prohibited from using the Sisterlocks brand name in their business name. (Pl. Exs. 17, 19.) While certified consultants may advertise their affiliation with Sisterlocks, they are required to clearly distinguish their business from Sisterlocks, Dr. Cornwell's business. (Id.) Both Ms. Belton and Ms. Edmonds testified that these guidelines in part prompted them to develop trade names that would distinguish their businesses from the Sisterlocks business. Moreover, Sisterlocks solicited advertisements from consultants and placed those advertisements on the Sisterlocks webpage. Ms. Belton testified that her business name and a link to her business website appeared on the Sisterlocks

webpage for over a year past the expiration of her Sisterlocks certification. This evidence disproves any allegation that Defendant's name was selected to capitalize unfairly on the name recognition of Sisterlocks. As a result, this Sleekcraft factor also favors Defendant.

The Court considers next the type of goods and the degree of care likely to be exercised by the purchaser. Sleekcraft, 599 F.2d at 348. Although Sisterlocks and Nappylocs both sell instructional and hair care products for locked hair styles, the pricing and substance of their product offerings are quite distinct: Nappylocs sells a instructional book for $22.95, while Sisterlocks markets a three-day training course in hair locking for approximately $995. The Sisterlocks training course may require travel by the participant, as in the case of Ms. Belton, and is a three-day commitment. Nappylocs, on the other hand, sells only a short book that the user can review and learn from in their home. Consequently, the content and presentation of the Sisterlocks and Nappylocs products are quite distinct. Sisterlocks is geared toward an audience seeking to develop a small business, while Nappylocs is designed for the individual who wants to do his or her own hair. Accordingly, the Sisterlocks training materials contain far greater and more detailed content than the Nappylocs book. Based on the evidence at trial, the Court concludes that the typical Sisterlocks consumer would not likely confuse these two disparate offerings as originating with the same source. See Entrepreneur Media v. Smith, 279 F.3d 1135, 1152 (9th Cir. 2002).

In addition, Dr. Cornwell presented no evidence of actual confusion, another Sleekcraft factor. Plaintiff did not enter into evidence any surveys to show that polled consumers would confuse the two companies. Vision Sports, Inc. v. Melville Corp., 888 F.2d 609, 615 (9th Cir. 1989). Plaintiff also did not present any records of calls received by the Sisterlocks office asking about Nappylocs services. On the contrary, Defendant presented evidence that it was Plaintiff who permitted an association between the two companies. Plaintiff placed an advertisement for Nappylocs on the Sisterlocks webpage, and allowed that link to remain even for over one year after Ms. Belton had decided not to re-certify with Sisterlocks. The lack of actual confusion also

supports Defendant.

The Court also considers the strength of the Sisterlocks mark. At trial, Ms. Belton claimed the Sisterlocks mark is descriptive of its associated product. No trademark protection is afforded to a mark that is descriptive of, or generic for, the qualities of the underlying product, unless the trademark holder can demonstrate that the mark has acquired secondary meaning in the minds of consumers. Japan Telecom, Inc. v. Japan Telecom Am. Inc., 287 F.3d 866, 872 (9th Cir. 2002). Ms. Belton, Dr. Cornwell's expert witness Sheila Everette Hale, and Renee Edmonds all testified that the components, "sister" and "locks," were independently generic or descriptive within the African-American community. That "sister" and "locks" may be descriptive and/or generic terms does not necessarily exclude their combination from trademark protection. If a compound word is itself inherently distinctive, it can be trademarked even if its component parts are generic or descriptive. Cal. Cooler, Inc. v. Loretto Winery, Ltd., 774 F.2d 1451, 1455 (9th Cir. 1985); Park 'N Fly, Inc. v. Dollar Park & Fly, 718 F.2d 327, 331 (9th Cir. 1983). As a compound term, "Sisterlocks" does not describe the underlying product–small, thin locks–in the way that, for example, the term "microlocks" might. Although each component of the Sisterlocks mark is generic or descriptive, together they create a distinctive mark entitled to trademark protection. Entrepreneur Media, 279 F.3d at 1141.

While Sisterlocks may have some secondary meaning, the preponderance of the evidence is that Sisterlocks is not a particularly strong mark. Mrs. Hale and Dr. Cornwell testified that some customers have asked for Sisterlocks by name, but the evidence was also that Sisterlocks accounts for only a small percentage of the natural hair care business. Dr. Cornwell admitted that the revenues of her company were much less than that of several other well known natural hair care providers, and that the number of Sisterlocks consultants is small relative to the overall number of natural hair care professionals. Plaintiff also did not deny that at least some of the news articles covering Sisterlocks were promotional pieces. While the Court considers Sisterlocks to be a distinct mark, the evidence does not show that it is particularly dominant within

its market.

Applying the Sleekcraft test to the totality of the evidence presented at trial, the Court concludes that no likelihood of confusion exists between Plaintiff's Sisterlocks

////

mark and Defendant's Nappylocs mark. Accordingly, the Court finds in favor of Defendant on the claim of trademark infringement.

B. Trade Dress Infringement

Plaintiff has alleged in a cursory fashion that her rights in the Sisterlocks trade dress were also violated by Defendant. For a claim of trade dress infringement, Plaintiff must prove that (1) the trade dress is nonfunctional, (2) the trade dress is inherently distinctive or acquired distinctiveness through secondary meaning, and (3) there is a likelihood that the public will confuse the alleged infringer's trade dress with that of the plaintiff's. Cal. Scents v. Surco Prods., 406 F.3d 1102, 1109 (9th Cir. 2005). "Trade dress involves 'the total image of a product and may include features such as size, shape, color or color combination, texture, graphics, or even particular sales techniques.'" Mattel Inc. v. Walking Mt. Prods., 353 F.3d 792, 808 (9th Cir. 2003).

Based on the totality of the evidence at trial, Plaintiff did not show that she possesses the rights to a protectable trade dress. Other than Mrs. Hale's and Dr. Cornwell's representations that some Sisterlocks customers have asked for the hairstyle by name, there was no evidence that the non-functional aspects of the Sisterlocks program had acquired secondary meaning. Rachel v. Banana Republic, Inc., 831 F.2d 1503, 1506 (9th Cir. 1987). Plaintiff did not enter into evidence any consumer surveys to show that Sisterlocks has a recognized trade dress. Vision Sports, Inc. v. Melville Corp., 888 F.2d 609, 614 (9th Cir. 1989) ("An expert survey of purchasers can provide the most persuasive evidence of secondary meaning."). Plaintiff admitted that Sisterlocks is a small company within the natural hair care field. Sisterlocks is not a franchised hair care system or salon. In fact, once trained, Sisterlocks consultants are encouraged to separate themselves from the Sisterlocks business and develop their own business names, services, and product. Based on the totality of the evidence presented

at trial, the Court concludes that the non-functional aspects of the Sisterlocks program do not have secondary meaning. See Rachel, 831 F.2d at 1506.

Even were that not true, Plaintiff's claim of infringement would fail based on the lack of evidence of consumer confusion. Id. There was no evidence at trial to show that consumers actually confused the Sisterlocks trade dress with the Nappylocs trade dress. Therefore, the Court enters judgment in favor of Defendant on the trade dress claim as well.

**2. Violations of the Uniform Trade Secrets Act**

California Civil Code 3426.1(d) defines a trade secret as "a formula, pattern, compilation, program, device, method, technique, or process that: (1) [d]erives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and (2) [i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Cal. Civ. Code § 3426.1(d). "Thus, the definition consists of three elements: (a) information (b) which is valuable because unknown to others and (c) which the owner has attempted to keep secret." ABBA Rubber Co. v. Seaquist, 235 Cal. App. 3d 1, 18 (1991). Plaintiff carries the burden of demonstrating that each of these elements is satisfied in this case. Imax Corp. v. Cinema Techs., 152 F.3d 1161, 1164 (9th Cir. 1998) ("A plaintiff seeking relief for misappropriation of trade secrets 'must identify the trade secrets and carry the burden of showing that they exist.'" (quoting MAI Sys. Corp. v. Peak Computer, Inc., 991 F.2d 511, 522 (9th Cir. 1993))).

Plaintiff has alleged that her Sisterlocks system is a protected trade secret that was misappropriated by the Defendant for use in her Nappylocs business. (Compl. ¶¶ 35-41.) Defendant defends on two bases: that Sisterlocks was known to others prior to its development by Dr. Cornwell, and that Dr. Cornwell has failed to adequately preserve the secrecy of the Sisterlocks process.

At trial, there was ample evidence to confirm that secrecy of the Sisterlocks method was not adequately preserved as to Ms. Belton. Critically, Plaintiff was unable to present evidence of any non-disclosure and/or confidentiality agreements between

Dr. Cornwell and Ms. Belton. The registration form signed by Ms. Belton at the commencement of her Sisterlocks training session states only that she "understand[s] that this SISTERLOCKS® training program is protected under a U.S. Trademark, training is administered only by Certified Training Associates, and certification under this program is not transferrable." (Pl. Ex. 17.) Missing from this agreement is any reference to the alleged secrecy of the Sisterlocks system and processes and Defendant's alleged obligation to maintain that secrecy. (Id.)

Plaintiff submitted an example of her trademark agreement, but did not submit a copy signed by the Plaintiff. Testimony from Dr. Cornwell and Mrs. Hale attested to Sisterlocks' custom and practice to distribute this agreement at the beginning of each training session. Ms. Belton, however, credibly testified that she did not see or sign this agreement as part of her Sisterlocks training. Ms. Belton testified that Mrs. Hale's training class started late and proceeded in an informal manner. Ms. Belton credibly testified that she left the Sisterlocks training at least one day early. Ms. Belton explained that she had traveled to Detroit, Michigan from her home in Chicago with her family on her children's spring break vacation from school, and the family had decided to return home early.

The Court concludes from the preponderance of the evidence that Defendant Belton did not enter into an agreement to be bound by the "Guidelines required by Sisterlocks." Plaintiff's exemplar trademark agreement provides:

> Please remember that when you offer the Sisterlocks natural hair care system, you are representing a TRADEMARK COMPANY. As you will discover, this can work to your great advantage. There are some general guidelines to follow however, to ensure that you don't conduct your business in a way that will put you in conflict with the legal owner of the Sisterlocks trademark:
> Guidelines required by Sisterlocks:
>
> > Always represent Sisterlocks as a trademark company, and represent yourself as an independent agent. This goes for information on flyers and in ads, as well as information distributed to customers, business cards, information on web pages, etc.
> >
> > By receiving the Sisterlocks training, you are legally authorized to offer and promote the services under the Sisterlocks name *as they have been taught to you*. Your training explicitly does not authorize you to train others. (This is especially true for trainees working in salon environments.) . . .

> Do not copy or reproduce Sisterlocks materials without authorization. This includes logos, newsletters, pictures, training materials, etc. This does not include informational materials produced by Sisterlocks for general information.

////

> **Never** advertise or promote the Sisterlocks company on a city, state or national level without prior approval from the Home Office.

(Pl. Ex. 17.)

No written record was presented at trial of Ms. Belton having signed this agreement and Ms. Belton credibly testified that she did not see or sign this document. Regardless, under the agreement she would not be committed to preserving the secrecy of the Sisterlocks processes. The agreement is primarily concerned with trademark use, not securing Sisterlocks as a trade secret. Although the agreement limits the trainee's ability to teach the Sisterlocks system, the testimony at trial indicated that this policy was to control quality, not preserve secrecy. The agreement does not prevent the trainee from demonstrating Sisterlocks services; in fact, trainees are authorized to "offer and promote" the Sisterlocks services. The agreement does not require that the Sisterlocks services be done out of public view in a private place. It also does not prohibit the photographing or videotaping of the Sisterlocks process.

In addition, the testimony at trial confirmed that during the relevant time period, nothing was said about a trade secret in any Sisterlocks course or training document. Mrs. Hale, an owner of a natural hair care salon, explained that while she knew she was not permitted to train others in the Sisterlocks technique, she did not style Sisterlocks customers in some hidden part of her salon. Ms. Luann Morman, a witness for the Plaintiff and certified Sisterlocks consultant, similarly testified that while she understood that she was not to train others in the Sisterlocks system, she did not take steps to conceal the Sisterlocks process when she was performing it on her clients' hair. Ms. Belton credibly testified that Ms. Morman often invited potential clients over for their initial consultation while she was locking the hair of an existing client. These potential clients would have had no contractual relationship with Sisterlocks and within an intimate home setting would have likely been able to observe the Sisterlocks

process. Neither Mrs. Hale nor Ms. Morman had their clients sign contracts to keep the Sisterlocks process secret. In addition, Mrs. Hale, a Sisterlocks trainer, testified that she never used the word "trade secret" or discussed trade secret concepts in her Sisterlocks courses. On cross-examination, Mrs. Hale also admitted that one looking over her shoulder as she did Sisterlocks in someone's hair could pick up the looping technique.

Dr. Cornwell's business plan confirms that preserving secrecy was not a goal of the Sisterlocks business. For example, in discussing the Sisterlocks curriculum, it is suggested that "its essential elements . . . could be replicated in a video format for marketing on a larger scale and at lower cost to the trainee." (Pl. Ex. 11 at 10.) The business plan indicates that Sisterlocks is "moving in th[e] direction" of large-scale distribution. (Id.) The business plan also contemplates site licensing, as a "way to establish a long-term income stream for business, while helping SISTERLOCKS accomplish its goal of training and educating the public on a mass scale." Large-scale video distribution, site licensing, and "training and educating the public on a mass scale" are all goals completely incompatible with preserving trade secrecy. (Id. at 12.) Despite this conflict between mass distribution and trade secrecy, Dr. Cornwell's business plan does not discuss how these competing goals might be reconciled. Although her business plan discusses trademark protection, it does not discuss any "trade secret." Similarly, in the Sisterlocks training videotapes, Dr. Cornwell encourages new consultants to purchase her "Come Home to Sisterlocks" materials and share them freely with family and friends to promote acceptance of their new locked look.

Based on Dr. Cornwell's business plan, the testimony of some of her consultants, and the totality of the evidence presented at trial, the Court concludes that trade secrecy was not prioritized during the early development of the business, as is often the case with new businesses. Defendant's Exhibit W, a photograph taken from Dr. Cornwell's book "A Tapestry of Dreams," depicts Dr. Cornwell appearing to place Sisterlocks in someone's hair at the Bronner Brothers Beauty Show. The evidence at trial was that,

at trade shows like the Bronner Brothers, attendance ranges from at least 15,000 to as many as 45,000 visitors. In the picture from "A Tapestry of Dreams," two women observe the hair locking process over Dr. Cornwell's shoulder. On cross, Plaintiff maintained that she was not actually demonstrating Sisterlocks, but instead just manipulating the hair to generate interest in the technique. Plaintiff's current recollection is in conflict with her previous memory of events, recorded in a caption in her book: "By 1996 we were taking our act on the road, and testing the waters at trade shows, like the huge Bronner Brothers hair show in Atlanta. We were quite a curiosity. At that time we were one of only two natural hair care booths at this show. We set up a chair in the isle (sic) and began to do someone's hair, and people starting flocking around us like flies!" (Def. Ex. W.) Ms. Edmonds and Ms. Belton testified that at trade shows they attended in Atlanta and in Chicago, consultants were demonstrating the Sisterlocks technique at the booths. Given the photographic evidence in Defendant's Exhibit W, the corroboration provided by other witnesses, and the Court's observation of the credibility of the witnesses, the Court concludes it more likely than not that Sisterlocks was in the past publicly demonstrated at major trade shows, like the Bronner Brother's Show, without adequate steps taken to protect the secrecy of the process.

Dr. Cornwell admitted on cross-examination that her training videotapes, viewed by all Sisterlocks trainees, do not contain any reference to a secret process. The videotapes themselves are not marked "Confidential." (Pl. Ex. 9A-9C.) Dr. Cornwell also admitted on cross-examination that in situations where a trainer has been terminated or left Sisterlocks, she did not demand that the trainer return his or her copy of the training materials. Further, Dr. Cornwell stated that she does not closely monitor the business of her Sisterlocks trainees to confirm that they are complying with her secrecy guidelines. She also does not regularly monitor the websites of Sisterlocks consultants, even though those websites are linked to her own. The evidence at trial also showed that Dr. Cornwell's training materials have been publicly available for several years through both the Library of Congress and through the internet as part of

the public case record for her earlier litigation, Cornwell v. California Board of Cosmetology.

////

From the evidence presented at trial, the Court concludes by a preponderance of the evidence that the Sisterlocks system was not "the subject of efforts that are reasonable under the circumstances to maintain its secrecy" as to the Defendant. Cal. Civ. Code § 3426.1(d). It was evident to the Court at trial that Dr. Cornwell feels passionately about retaining control over the Sisterlocks system and did take some steps towards that end. In the future, she may consider protecting her system through extensive contractual means or through franchising agreements. Based on the information presented at trial and the attitude and credibility of the witnesses, the Court concludes that, as to Defendant, Plaintiff took inadequate steps to protect the confidentiality of her alleged trade secrets at that time.

The lack of secrecy is sufficient to negate Dr. Cornwell's claim to trade secret protection, but the Court additionally considers whether Sisterlocks "[d]erives independent economic value, actual or potential, from not being generally known to the public." Cal. Civ. Code § 3426.1(d). In other words, if the Sisterlocks technique is already within the public domain, there would be no independent economic value generated continued secrecy. Here, the evidence at trial showed that while some elements of the Sisterlocks system are public knowledge, the combined system could have independent economic value.

Dr. Cornwell testified to the various components of her Sisterlocks system. These include analysis of the texture of the hair; parting and section considerations; locking patterns, finger positions, and tool application; shampooing; retightening and remedy techniques; and troubleshooting, including for example, damage to hair or hairline, and combining locks. Of these, the Court concludes primary advantage of Dr. Cornwell's system was the circular looping patterns. Based on the evidence presented at trial, the Court concludes that the Sisterlocks information regarding the texture of African-American hair, the description of how to part and section the hair, the sizing

guidelines, and the recommendations for shampoo and product use were not novel to the Sisterlocks system.

////

Mrs. Hale and Ms. Edmonds both testified that a "proprietary" hair technique would be very unusual within natural hair care industry. On the contrary, both stylists testified that in their experience, new techniques are regularly shared amongst stylists on an informal basis. Within a salon like Mrs. Hale's, this sharing can be a way for stylists to lesson the costs of learning a new technique. Stylists typically also freely practice new techniques on friends and family. Dr. Cornwell admitted that her goal of making Sisterlocks a proprietary system was highly atypical in the natural hair care field.

Dr. Cornwell's assertion in this case that these elements are somehow proprietary to Sisterlocks is in conflict with the position adopted by the Plaintiff in Cornwell v. California Board of Barbering and Cosmetology, No. 97-CV-138. In that case, Dr. Cornwell, as one plaintiff, emphasized the extensive historical traditions behind natural hair care: "The bases for these [locking] techniques originate many centuries ago in Africa and were brought by Africans into this country, where the methods have endured (and have been expanded upon) as a distinct and popular form of hair styling primarily done by and for persons of African descent." (97-CV-138, Complaint, Doc. No. #1, ¶ 23.) The California Board Plaintiffs also described how American natural hair care practitioners have but "added new techniques to the craft's vast portfolio" of traditions from thousands of years of development in Africa. (97-CV-138, Doc. # 108.)

With a historical backdrop for natural hair care that Plaintiff agrees goes back for thousands of years and spans at least two continents (97-CV-138, Doc. # 108), it is difficult to see how Plaintiff's particular characterization of curl patterns, parting methods, lock size, and use of a tool to create locks were new developments within the field. Indeed, the evidence presented at trial demonstrated that these elements were independently and generally well known in natural hair care prior to Dr. Cornwell's Sisterlocks technique.

The Court considers first lock size and use of a tool to create locks. As part of an array of photographs of dreadlocked individuals, Defendant submitted photographs of the Maasai Tribe in Africa. (Def. Ex. AM.) Some Maasai Tribe members wear their hair in small, thin locks very similar in appearance to Sisterlocks. Like Sisterlocks, the typical number of locks for a Massai Tribe member would be around 400 to 450. In addition, Defendant presented numerous other photographs of individuals wearing their hair thin to average size locks that were not Sisterlocks. (Def. Ex. A.) On cross-examination, Mrs. Hale agreed with the Defendant that traditional locks can be small and that the parting used in the Sisterlocks system is not unique. Ms. Edmonds' hair, styled in her own "Twisty Locks," also demonstrates that thin locks are not unique to Sisterlocks. Ms. Edmonds also testified that before she knew of Sisterlocks, she had already observed another stylist creating thin locks in a friend's hair through looping at the Sweet Potato Pie natural hair salon in Atlanta, Georgia. Ms. Edmonds testified that this process was called "interlocking."

Mrs. Hale also admitted that stylists have commonly used tools to create locks prior to Sisterlocks. In her book, Ms. Belton includes a picture of a early 20th century pressing comb used to make locks. (Def. Ex. EE.) Defendant has also submitted into evidence various latch hooks and needles used to make locks. (Def. Ex. CC.) Ms. Edmonds also testified that she had seen hook tools similar to Sisterlocks' sold by a hairstylist also in Atlanta, Georgia. In addition, Defendant submitted evidence of a "Topsy Tail" hairstyling tool that loops a ponytail through itself from tip to head to create an inverted look. (Def. Ex. P.) According to Defendant, this tool was invented in 1991, two years prior to Dr. Cornwell's development of Sisterlocks. Defendant represented that approximately $114 million in "Topsy Tail" products have been sold. Mrs. Hale agreed on cross-examination that the basic mechanism of looping from the tip to the head used in "Topsy Tail" is similar to Sisterlocks, although to a much different extent and within entirely different markets. The preponderance of the evidence at trial showed that the use of tools to make locks and loop the hair had commonly occurred prior to the development of Sisterlocks.

In addition, in this case Dr. Cornwell claims that the Sisterlocks characterization of the curl pattern was innovative and new, but in the California Board case, the Court understood Dr. Cornwell to be "admittedly deficient in knowledge of the physical and chemical structure of hair and anatomy, as well as disease recognition, sanitation, and hygiene." (97-CV-138, Doc. # 136 at 9.) Similarly, at trial Dr. Cornwell emphasized the critical importance of shampooing and hair care as part of her Sisterlocks system, but in the California Board case, Dr. Cornwell disavowed shampooing her clients, and represented that the sale of shampoo was primarily a marketing consideration that was separate from her locking activities. (Id. at 10, n. 18.) Mrs. Hale confirmed that Sisterlocks is not the only system that offers shampoos. Based on the evidence at trial, Dr. Cornwell cannot claim that her curl pattern analysis and shampooing advice are proprietary.

Dr. Cornwell does not have a method patent for the Sisterlocks technique, nor does she have a utility or design patent for her Sisterlocks tools. Although she has taken some steps to limit the use of her Sisterlocks training materials and brand name, she has not retained sufficient secrecy over the methodology of Sisterlocks hair locking to make a persuasive argument under the totality of the evidence for trade secret protection as to Defendant Belton. She has not shown that she has a nondisclosure or franchise agreement with the Defendant. Dr. Cornwell has a trademark for her business name and a copyright for her videos and workbooks, but without patent, trade secret, or contract protection, the ideas of hair locking used as part of the Sisterlocks system are not "proprietary" to Dr. Cornwell, and she cannot prevent others, like the Defendant, from adding to and modifying with their own creativity the skills and techniques taught in her Sisterlocks class.

Indeed, the vast portfolio of techniques and experience in natural hair care prevents Dr. Cornwell from calling some aspects of Sisterlocks her own innovation. As Dr. Cornwell represented to the Court in California Board, "many African-Americans view African hairstyles as an expression of their self-identity and cultural heritage because those styles emphasize the beauty of natural characteristics of black

hair." (97-CV-138, Doc. # 87 at 8.) In addition to this free cultural expression, the California Board plaintiffs sought to preserve for natural hair care stylists "the right to earn an honest living" through "legitimate business and employment opportunities." (Id. at 37-39.) The California Board plaintiffs explained that "[g]iven that African hairstyling requires little capital or formal education, it is a tragedy to deny people those precious opportunities" to earn a living in those fields. (Id. at 37-38.)

In this case, however, Dr. Cornwell adopts the opposite position, seeking to exclude other natural hair care stylists from receiving these cultural and economic benefits from thousands of years of natural hair care tradition. Like the California Board plaintiffs, Defendant Belton and witness Edmonds testified here to their desire, as African-American women, to practice their culture through hair-locking techniques, as well as to develop and grow their own hair care businesses. Both Ms. Belton and Ms. Edmonds testified that one of their primary reasons for taking the Sisterlocks course was because of the associated business opportunities. Ms. Belton, a stay-at-home mother, explained how she wanted to learn Sisterlocks in part to bring in a little extra money for her family and to save the cost of having her hair done. According to Ms. Edmonds, also an African-American woman, her involvement with Sisterlocks arose out of the promise of a Sisterlocks trainer that by becoming certified in Sisterlocks, she could practice natural hair care in Georgia without being licensed in cosmetology. Ms. Edmonds saw Sisterlocks as an opportunity to cultivate a business in natural hair care without going to cosmetology school while she completed her master's degree. Ms. Edmonds testified that her second reason for joining Sisterlocks was her understanding that Sisterlocks would refer new clients to her. New to Georgia, Ms. Edmonds saw Sisterlocks as an opportunity to develop a network of clientele. Ms. Edmonds testified that for these two reasons only she paid the significant price for Sisterlocks training. The testimony of the witnesses about their desire to practice their own culture and grow their own business echos the arguments made by the Plaintiff and others in the California Board case.

Based on the evidence at trial, the Court concludes that Dr. Cornwell cannot use

trade secret law to exclude others like Ms. Belton from practicing her hair locking business and operating her website. Because the secrecy of the Sisterlocks process was not adequately preserved as to Ms. Belton during the relevant time period and because many of the elements of the Sisterlocks processes were well-known, Plaintiff does not have a claim for violations of the UTSA under the law. Accordingly, the Court enters judgment in favor of the Defendant on the UTSA claim.

**3. Unfair Competition**

In conjunction with her claims for violations of Sisterlocks' trademark and trade secrets, Plaintiff alleges that Defendant has engaged in unfair competition under California Business and Professions Code § 17200, et seq. by representing that she has created a created a new method for locking hair, and by confusing clients about the relationship between Sisterlocks and Nappylocs.

First, the Court has already rejected Plaintiff's contention that the names "Sisterlocks" and "Nappylocs," and their associated product offerings are confusingly similar. The Court has found Sisterlocks and Nappylocs to be sufficiently distinct so that potential customers are unlikely to confuse the two companies. Second, Defendant's publications do not mention Sisterlocks other than stating on the back cover of the 2002 version[2] that Ms. Belton "completed advanced Sisterlocks TM Consultant class . . . and went on to be certified in this technique." (Pl. Ex. 40.) The biographical statement goes on to distinguish Ms. Belton's Sisterlocks experience from her development of Nappylocs: "While practicing in Chicago she developed new patterns and tools to assist the diverse needs of her clients." (Id.) Third, Plaintiff did not present any evidence of actual consumer confusion between these two companies. In fact, the evidence showed that Plaintiff voluntarily listed the Nappylocs webpage on her Sisterlocks website for over one year after Ms. Belton's Sisterlocks certification had lapsed. From the evidence presented at trial, the Court concludes that Defendant has not unfairly confused clients about an affiliation between Nappylocs and

---

[2] This biographical section has been eliminated from the 2004 version of the Nappylocs book. (Def. Ex. EE.)

Sisterlocks.

////

////

Similarly, Defendant did not unfairly compete with Plaintiff by marketing her own technique of locking hair as different from Sisterlocks. There was no evidence presented at trial that either Ms. Belton or Ms. Edmonds signed a covenant not to compete with Sisterlocks. Such an agreement would not be enforceable in California. Cal. Bus. & Prof. Code § 16600.

The evidence presented at trial also confirmed that there are multiple differences between the appearance and the techniques of Sisterlocks and Nappylocs. On cross-examination, Plaintiff's expert witness, Mrs. Hale agreed with Defendant that because Sisterlocks offers only a few looping patterns, locks created using different looping patterns would not be Sisterlocks. Nappylocs offers an eight-point, six-point, and two-point patterns that are not Sisterlocks patterns, even according to Plaintiff's expert witness Mrs. Hale. The overlap between the Nappylocs and Sisterlocks patterns is primarily limited to the circular looping map. Certainly, Dr. Cornwell cannot contend proprietary rights over a circle with directional points. See, e.g., United States v. Hamilton, 583 F.2d 448, 451 (1978).

Mrs. Hale, the expert witness for Plaintiff, also agreed on cross-examination that if a different size tool were used–as is the case with Nappylocs–the locks could not be considered Sisterlocks. The Court observed the Sisterlocks' and Nappylocs' tools side-by-side and found them to be different in shape and material. (Def. Ex. AA; Pl. Ex. 40.) Additionally, if the locks were made or maintained using wax, glue, or oils, Mrs. Hale testified that they would not fit within the definition of "Sisterlocks." Nappylocs permits customers to use these artificial products on their locks (Def. Ex. EE at 12, 30), while Sisterlocks prides itself on an all-natural approach to hair care.

The testimony of all of the witnesses was that thin lock size is the hallmark of the Sisterlocks system. Mrs. Hale testified that if locks were outside the Sisterlocks

sizing guidelines in size or number, they would not be considered Sisterlocks.[3] In the Nappylocs books, most of the featured models have large locks that number between 100 and 350 total locks. The testimony at trial was that the number of locks recommended for a Sisterlocks style was much greater, between 400 and 450. Differences in the appearance of the locks were obvious to the Court in its visual comparison of Dr. Cornwell's and Ms. Morman's hair, styled in Sisterlocks, to Ms. Belton's and Ms. Belton's daughter's hair, styled in Nappylocs. The locks of Ms. Belton and her daughter are noticeably thicker than Dr. Cornwell's and Ms. Morman's.

Mrs. Hale also testified on cross-examination that overlap between the two systems was in areas common to the hair care industry. For example, Mrs. Hale testified that systems other than Sisterlocks teach how to analyze the hair, how to part the hair, how to loop the hair, and what products to use on the hair. Ms. Edmonds testified that she had observed another stylist creating locks that were not Sisterlocks but used a similar looping pattern called "interlocking" at the Sweet Potato Pie salon in Atlanta, Georgia. Mrs. Hale also admitted that many other locking stylists employ a tool, including Amazon Smiley, once trained in Sisterlocks, who Mrs. Hale testified uses a latch hook to create locks.

Importantly, "[a] court cannot properly exercise an equitable power without consideration of the equities on both sides of a dispute." Cortez v. Purolator Air Filtration Products Co., 23 Cal. 4th 163, 180 (2000). "[I]t is axiomatic that one who seeks equity must be willing to do equity." Id. (quoting In re Marriage of Plescia, 59 Cal. App. 4th 252, 257-258 (1997)). A court's equitable power under section 17200 is both discretionary and very broad. Id. In this case, Defendant submitted significant evidence, much of which was not contested, to demonstrate Plaintiff's efforts to improperly assert a monopoly over this style of hair locking. On balance, the Court

---

[3] Sisterlocks does offer a system for men, Brotherlocks, that utilizes a larger parting and lock size. There is no evidence that Ms. Belton was ever exposed to the Brotherlocks' techniques, however. Brotherlocks is not taught as part of the basic Sisterlocks training course that Ms. Belton completed, and Brotherlocks is not a requirement for the Sisterlocks certification Ms. Belton received. Without evidence that Ms. Belton had been exposed to Brotherlocks, any variations Ms. Belton employs with respect to lock size were more likely than not of her own creation.

concludes that the equities do not favor Plaintiff.

////

Ms. Edmonds, a natural hair care stylist, testified credibly about extreme difficulties and personal attacks she suffered after deciding she no longer wished to be affiliated with Sisterlocks. According to Ms. Edmonds, when she first became interested in Sisterlocks, it was represented to her as an opportunity for her to start her own hair business without having to acquire a cosmetology license. Ms. Edmonds testified that she was also told that she would receive business referrals from the home office. In school for her master's degree and new to Georgia, Ms. Edmonds saw Sisterlocks as an opportunity to legally build a business in natural hair care without the expense and time required to receive a cosmetology license.

After receiving her certification, Ms. Edmonds represented Sisterlocks for free at trade shows, but did not receive referrals for any of the new business from the Sisterlocks home office. Ms. Edmonds opined that this reflected the preference of Sisterlocks to train any new customers for $995 each as opposed to referring them as clients to those already certified as Sisterlocks consultants. In the latter scenario, Sisterlocks does not share in the profits of its consultants. Ms. Edmonds testified that she subsequently became aware that Sisterlocks was purposely declining to extend her new business; some clients told her that the Sisterlocks home office had described her as "unreliable" and "too expensive." Ms. Edmonds testified that her only communication with the home office was when they wanted her to sell or purchase Sisterlocks products.

During her time as a Sisterlocks consultant, Ms. Edmonds continued to offer her clients a locking technique she called Twisty Locks. Ms. Edmonds testified that she had always separated her business name, Twisty Locks, from Dr. Cornwell's, Sisterlocks. When Ms. Edmonds realized that Sisterlocks was not a productive venture for her and that she would not receive any license from Sisterlocks that would exempt her from Georgia's cosmetology laws, she stopped offering those services and instead offered only Twisty Locks. She also enrolled in cosmetology school.

Dr. Cornwell resisted Ms. Edmonds' efforts to sever her ties with the Sisterlocks company by sending both Ms. Edmonds and her mother, Lottie Edmonds, a letter requesting that they re-certify. Dr. Cornwell wrote that she had "always respected you both and your work," but warned the Edmonds that they "may not simply continue to offer Sisterlocks under another name, or without making reference to the fact that they are actually Sisterlocks." (Def. Ex. R1.)

When Ms. Edmonds and her mother chose not to re-certify, Dr. Cornwell sent both a cease-and-desist letter accusing both of plagiarizing Sisterlocks materials, misappropriating the proprietary locking system, and misrepresenting Twisty Locks as Sisterlocks. This cease-and-desist letter was copied to legal counsel at the Georgia International Convention Center, where Ms. Edmonds was scheduled to teach a class in Twisty Locks at the World Natural Hair and Beauty Show. The World Natural Hair and Beauty Show has approximately 15,000 attendees. As a result of the letter and the threats of suit, Ms. Edmonds testified that her class was cancelled, but she was permitted to retain a booth at the Hair Show. At the Hair Show, Dr. Cornwell widely distributed a "Buyer Beware!" flier to attendees that accused Twisty Locks of being a "disreputable, bootleg operation" and of operating a "Twisty Locks fraud." (Def. R2.) Ms. Edmonds testified that these fliers caused her to lose significant business and injured her reputation. Importantly, Ms. Edmonds testified all actions taken against her by Dr. Cornwell occurred without Dr. Cornwell ever seeing what Twisty Locks looked like or how they were installed.

The evidence at trial showed that Ms. Edmonds was not alone in her difficulty in extracting herself from Sisterlocks. Defendant testified that she too was on the receiving end of several accusatory letters from Plaintiff, culminating in this litigation. Ms. Belton credibly testified that she also has received threatening phone calls and anonymous mail as a result of her choice to leave Sisterlocks and offer her Nappylocs services. Ms. Belton echoed Ms. Edmonds' statement that Dr. Cornwell took all actions against her without first contacting her or viewing her services.

Ms. Edmonds testified that payment of a certification fee, in her view, appears

to be the only way one can remain in good standing with Sisterlocks and avoid professional disrepute. Defendant Belton entered into evidence a January 2003 Sisterlocks document that states:

> We will publish an *Official Registry of Certified Sisterlocks Consultants* on our website. Only those whose Certification is valid and current will be listed. THIS WILL BE THE DIFINITIVE (sic) LIST OF LIGITIMATE (sic) CERTIFIED PRACTITIONERS WORLDWIDE. We will widely publish the fact that Sisterlocks ONLY endorses and promotes these individuals who remain in good standing with the company. Also, when people call for referrals, we will only refer those who appear on our Official Registry.
>
> ...
>
> We will create a page on the website for "DISCIPLINARY ACTION." This page will list individuals we know to be misrepresenting the Sisterlocks trademark, and who refuse to "cease and desist." Names will appear on this page only after adequate attempts have been made to correct legitimate problems.

(Def. Ex. R5.) Certification is a mail-order process by which trainees send in to the Sisterlocks home office, with an additional fee, photographs of three Sisterlocks hairdos they have done. The testimony differed as to whether these photographs are actually scrutinized prior to the issuance of the Sisterlocks certification.

Given the totality of the evidence, the Court concludes that plaintiff has not proven a claim for unfair competition against Defendant. In addition, the equities favor the Defendant. Cortez, 23 Cal. 4th at 181 ("[C]onsideration of the equities between the parties is necessary to ensure an equitable result."). While trademark and copyright law may protect Dr. Cornwell's business name and her original, copyrighted work, they do not entitle her to a monopoly over hair locking processes based on the present state of the record.

A fundamental precept of intellectual property law is the protection of the public domain. Satava, 323 F.3d at 813. One cannot capture ideas from the public domain and claim them as one's "proprietary" concept or as "intellectual property." The Ninth Circuit has explained, in the context of copyright law, that ideas in the public domain that belong to the "common heritage of humankind" cannot be "seized" by individuals for "exclusive use" via intellectual property law. Id. at 811, 813. In the California Board case, Dr. Cornwell, as one plaintiff, represented in her complaint that "[t]he

bases for these techniques originate many centuries ago in Africa and were brought by Africans into this country, where the methods have endured (and have been expanded upon) as a distinct and popular form of hair styling primarily done by and for persons of African descent." (97-CV-138, No. #1, ¶ 23.) The evidence in this case shows that in developing the Sisterlocks technique, Plaintiff developed an innovative and creative method of locking hair of that subsequently became of some practical and cultural importance to many individuals primarily of African descent. However, the evidence, including Plaintiff's own statements from her previous California Board of Cosmetology case, also shows that in developing her technique, Plaintiff was relying, incorporating, and building on her extensive knowledge as an academic in the field of African studies and on well-known hair styling techniques that had "originat[ed] many centuries ago in Africa" and had continued to be practiced and refined by innumerable individuals since then. Just as Plaintiff benefitted from her learning and experiences with these practices and African culture, she cannot prevent others from building creatively on the skills and training she teaches as part of her Sisterlocks course without a clear and legally enforceable contractual agreement. Plaintiff may prevent others from unauthorized use of her business name and written and video materials, and she may contract to protect her processes, but Plaintiff cannot use intellectual property law to recapture fundamental elements of hair styling such as parting, shampooing, looping, and locking, and then exclude others from utilizing those same skills.

Based on the totality of the evidence, the Court concludes that Plaintiff has fallen short of her burden for a claim of unfair competition. As a result, the Court enters judgment in favor of the Defendant on this claim.

**4. Interference with Economic Advantage**

Under California law, to make a claim for interference with economic advantage Plaintiff must show "(1) an economic relationship existed between the plaintiff and a third party which contained a reasonably probable future economic benefit or advantage to plaintiff; (2) the defendant knew of the existence of the relationship and was aware or should have been aware that if it did not act with due care its actions

would interfere with this relationship and cause plaintiff to lose in whole or in part the probable future economic benefit or advantage of the relationship; (3) the defendant was negligent; and (4) such negligence caused damage to the plaintiff in that the relationship was actually interfered with or disrupted and plaintiff lost in whole or in part the economic benefits or advantage reasonably expected from the relationship." N. Am. Chem. Co. v. Sup. Ct., 59 Cal. App. 4th 764, 786 (1997).

Plaintiff admitted at trial that she has never sought licenses for natural hair care, cosmetology, or education in any of the states where she teaches or practices Sisterlocks. On this basis, Defendant notified state authorities in at least New York, Tennessee, and Illinois of Plaintiff's intent to teach a Sisterlocks course in those states without a license. Sisterlocks was subsequently investigated by the Tennessee Board of Cosmetology, New York State Education Department, and the Illinois Department of Professional Regulations. (Pl. Ex. 26-28.)

Based on the totality of the evidence presented at trial and the credibility and demeanor of the witnesses, the Court concludes that Plaintiff's claim for interference with economic advantage fails. Defendant has a right under the First Amendment to inform the government of behavior that potentially may violate its laws. Single Moms, Inc. v. Mont. Power Co., 331 F.3d 743, 748-49 (9th Cir. 2003). Regulation of cosmetology and natural hair care practices may be legitimate exercises of state police powers. In the California Board case, the Court agreed with Dr. Cornwell that natural hair care practitioners were exempted from the state's cosmetology licensing requirements, but that decision is binding in California only. Whether New York, Illinois, and Tennessee require licenses for hair locking or for teaching a course in their state are matters left to those states. At trial, Dr. Cornwell testified that until the constitutionality of these other cosmetology and natural hair care laws are tested in court, she did not consider herself bound to comply with the licensing requirements. While Dr. Cornwell may hold a view that these laws do not apply to her, she cannot prevent Defendant from informing these states of potential violations under the First Amendment. See Eastern R. Presidents Conference v. Noerr Motor Freight, Inc., 365

U.S. 127, 137 (1961).

////

There may be valid health reasons for some state oversight of natural hair care and certain states offer natural hair care licenses. Ms. Edmonds and Ms. Belton both testified about the risk of transmission of HIV/AIDS and other communicable diseases, as well as the risk of damage to the client's scalp and hair by an untrained practitioner. If Ms. Belton believes that the states' licensing powers are implicated by Sisterlocks' courses, it is within the exercise of her First Amendment rights to file a report with the appropriate authorities.

Moreover, since at least 1998, Dr. Cornwell has been aware of new laws affecting natural hair care in many states. In her California Board case, Dr. Cornwell cited Maryland, New York, Washington D.C., Michigan, Tennessee, and Florida as examples of states that had exempted natural hair care from the normal cosmetology licensing regime. Dr. Cornwell, as a California Board plaintiff, advocated that "[w]hile California persists in subjecting African hairstylists to the full demands of cosmetology licensing, several other jurisdictions either have created limited licenses for natural hairstylists (just as California has for nail care, skin care, and electrolysis) or have exempted them from licensing altogether." (97-CV-138, Doc. # 86 at 19.) At least two of the states where Ms. Belton filed her reports, New York and Tennessee, have adopted an alternative natural hair care licensing system that Dr. Cornwell held up as an example in California Board. Yet, Dr. Cornwell admitted at trial that she has never sought natural hair care licenses from those states that do offer them.

Ms. Belton cannot be penalized for noting the apparent conflict between these state laws and Sisterlocks' unlicensed status, and reporting it to appropriate state authorities. Limiting Ms. Belton's ability to lodge a complaint with the government would unfairly inhibit her First Amendment rights. Eastern R. Presidents Conference, 365 U.S. at 137. As a result, Plaintiff's claim for interference with economic advantage fails.

////

////

**5. Copyright Infringement**

Plaintiff also claims multiple violations of her copyrights by the Defendant. Plaintiff alleges that Defendant misappropriated copyrighted material from the Sisterlocks training workbooks and videos, and used that material without authorization in the Nappylocs book and webpage.

A. Legal Standard

To prove copyright infringement, Plaintiff must show "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361 (1991). Copying can be established by showing that the allegedly infringing party had access to the copyrighted work, and that the works in question are substantially similar. Rice v. Fox Broadcasting Co., 330 F.3d 1170, 1174 (9th Cir. 2003). In this case, the validity of Dr. Cornwell's copyright registration is not in question. Similarly, Ms. Belton does not deny that she had access to the copyrighted works as part of her Sisterlocks training. What does remain in dispute is whether the Sisterlocks and Nappylocs materials are substantially similar, and whether Dr. Cornwell's alleged unauthorized use of a third party's copyrighted materials in her books bars her claim for copyright infringement against Ms. Belton under the doctrine of unclean hands.

Section 102 of title 17 sets the parameters for the subject matter of copyright. A work must be "fixed in any tangible medium of expression" and must fall within the following categories: "(1) literary works; (2) musical works, including any accompanying words; (3) dramatic works, including any accompanying music; (4) pantomimes and choreographic works; (5) pictorial, graphic, and sculptural works; (6) motion pictures and other audiovisuals works; (7) sound recordings; and (8) architectural works." 17 U.S.C. § 102(a).

Section 102 places an important limit on the scope of copyright protection: "In no case does copyright protection for an original work of authorship extend to any idea,

procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work." Id. § 102(b). In short, "[c]opyright law protects an author's expression; facts and ideas within a work are not protected." Shaw v. Lindheim, 919 F.2d 1353, 1356 (9th Cir. 1990). "The real task" for the Court in a copyright infringement action is "to determine whether there has been copying of the expression of an idea rather than just the idea itself." Krofft Television Productions, Inc. v. McDonald's Corporation, 562 F.2d 1157, 1163 (9th Cir. 1977). "It is an axiom of copyright law that the protection granted to a copyrighted work extends only to the particular expression of the idea and never to the idea itself." Id.

To this end, the Ninth Circuit has articulated a two-part analysis of an "extrinsic" and "intrinsic" test for copyright infringement. Id. Plaintiff must prove substantial similarity under both tests to prevail. Shaw v. Lindheim, 919 F.2d 1353, 1356 (9th Cir. 1990). These test have been described as the "objective and subjective analyses of *expression*[.]" Id. For the extrinsic test, the Court adopts an objective perspective from which it compares the "articulable similarities between the plot, themes, dialogue, mood, setting, pace, characters, and sequence of events." Kouf v. Walt Disney Pictures & Television, 16 F.3d 1042, 1045 (9th Cir. 1994). On the other hand, "a judicial determination under the intrinsic test is now virtually devoid of analysis [and] . . . has become a mere subjective judgment as to whether two literary works are or are not similar." Shaw, 919 F.2d at 1357.

Importantly, similarity in expression resulting from unprotectable elements of the copyrighted work may not be considered throughout this analysis. Rice, 330 F.3d at 1174. Put another way, "if the similarities between two works are confined to nonprotectible ideas, there is no infringing similarity." Worth v. Selchow & Righter Co., 827 F.2d 569, 572 (9th Cir. 1987). The separation of protected expression from unprotectable ideas is a challenging, fact-specific inquiry that the Ninth Circuit has described as "necessarily imprecise" and "ad hoc." Shaw, 919 F.2d at 1356.

Because of the limited scope of protection for ideas, factual works receive

distinct treatment from fictional works under copyright law. Worth, 827 F.2d at 572. This legal distinction recognizes that as opposed to fictional works, where ideas can be expressed "with infinite variations in setting, sequence of incident, and characterization[,] . . [subsequent authors wishing to express the ideas contained in a factual work often can choose from only a narrow range of expression." Landsberg v. Scrabble Crossword Game Players, Inc., 736 F.2d 485, 488 (9th Cir. 1984). Because one expressing a fact by necessity must present the same core of information, a "substantially similar paraphrase" of a factual idea cannot be enough for infringement. Id. "Similarly, expressions that are standard, stock, or common to a particular subject matter or medium are not protectable under copyright law." Satava v. Lowry, 323 F.3d 805, 810 (9th Cir. 2003). In short, with factual works, "similarity of expression may have to amount to verbatim reproduction or very close paraphrasing before a factual work will be deemed infringed." Landsberg, 736 F.2d at 488.

The distinctions drawn between idea and expression, and between factual content and creativity content, are an expected consequence of the dual goals of copyright law–to protect the public domain while also encouraging creativity. Copyright law cannot be used to reclaim for one's own "unprotectable ideas and standard elements . . . that are part of the public domain" and "the common property of all." Satava, 323 F.3d at 811. This is not to say that no combination of facts, unprotectable ideas, and standard elements will not receive some copyright protection. On the contrary, if such a combination reflects a purposeful selection and creative arrangement of numerous elements, that combination would itself constitute an original work of authorship. Satava, 323 F.3d at 811.

With these legal principles in mind, the Court now compares Defendant's allegedly infringing works to Sisterlocks' copyrighted training materials.

B. Extrinsic (Objective) Test for Copyright Infringement

The Court begins with its objective comparison of the Nappylocs book to the Sisterlocks workbooks and training videos. The Court notes that the bulk of the information presented by Sisterlocks is contained within the videos, not the workbooks,

which merely summarize, in abstracted outline form, the basic organizational structure of the videos. Because Ms. Belton's book contains writing and pictures, it bears little similarity in expression to Sisterlocks' high-level, outline-only workbooks. A fair comparison can only really be made between the Sisterlocks videos and the Nappylocs book. The Court is therefore in the somewhat challenging position of comparing videos to a book for substantial similarity. In addition to listening to the testimony at trial, the Court has carefully reviewed all nine of Sisterlocks' video lessons, both the 2002 and 2004 version of the Nappylocs book, and Plaintiff's Exhibit 22, which compares the two works.

The Court's first task is to separate protected expression from unprotected ideas within the Sisterlocks materials. The Court will then compare that protected expression to the content of the Nappylocs book and determine if a substantial degree of similarity exists between those items.

After considering the structure and content of the Sisterlocks program, the Court concludes that there are two levels at which unprotected ideas must be excluded. First, there are several Sisterlocks lessons which contain material that falls squarely within the public domain. Because those lessons are highly factual and comprised entirely of what the evidence at trial showed is publicly known information, Plaintiff receives minimal protection; only near-verbatim copying would constitute infringement. <u>See</u> <u>Satava</u>, 323 F.3d at 813 (explaining that an author receives copyright protection only for "the original expression he or she contributes" to publicly known ideas). The remaining Sisterlocks lessons contain material that is highly factual but less firmly committed to the public domain. In those areas, Plaintiff engages in a greater proportion of protected expression, requiring a close and specific comparison between Plaintiff's and Defendant's works.

The Court considers first the Sisterlocks lesson on "Parting and Sectioning" of the hair, lesson 3. In this lesson, Plaintiff instructs how to divide the hair into six to twelve sections. Plaintiff explains that in sectioning the hair, one should be looking for changes in density and texture, and dry and/or thin spots within the hair. Plaintiff

then advises that each section should be secured. After sectioning is complete, Plaintiff describes her technique for parting each section into small squares for locking. Plaintiff provides sizing guidelines for the squares of one-eight to one-quarter inch for microlocks; one-quarter to one-third inch for average-size locks, and one-third to one-half inch for large locks. Locks larger than one-half inch are "out of the question." In the video, Plaintiff states that if locks are made larger than one-half inch "you might as well call them something else because they won't behave like Sisterlocks anymore."

The evidence at trial demonstrated that hair combing, parting, and sectioning are essential to styling of all types of hair. For example, Plaintiff's expert witness, Mrs. Hale, admitted on cross-examination that the Sisterlocks method of parting and sectioning was not unique. The evidence was that other types of locking, as well as braiding, plaiting, extensions, and weaves are styles in which the hair is parted and sectioned. Given the universality of hair sectioning and parting, no method of combing, parting, and sectioning the hair will be particularly unique. These common techniques may only be expressed in a limited number of ways, and "[j]ust about any subsequent expression of that idea is likely to appear to be a substantially similar paraphrase of the words with which the [Plaintiff] expressed the idea." Landsberg, 736 F.2d at 488. In addition, Plaintiff undoubtedly drew on common knowledge in preparing her parting and sectioning chapter. It would be contrary to the law for Plaintiff to receive a monopoly on these commonplace ideas. Id. at 489.

Plaintiff's own graphical expression of these ideas is protected, however. Sisterlocks provides its trainees with a Sisterlocks' parting sizes card that depicts blocks representing large, medium, and small parting sizes. (Def. Ex. AA.) On page 7 of Defendant's 2004 book, Defendant uses identical blocks to show small, medium and large block sizes for hair parting. While parameters for hair parting size like one-quarter or one-half inch might be a common and necessary direction, Plaintiff's sizing card with a visual representation of the desired sizes is a creative and original expression of that idea. Defendant's use of a near-identical graphic to make the same points about sizing constitutes unauthorized copying. Defendant can convey her

similar sizing directions and parameters within her book, but she cannot communicate those ideas in a fashion identical to Plaintiff.

The Court considers next Plaintiff's description and categorization of hair types for individual of African descent. That Plaintiff observed that the curliness of hair can vary along a spectrum that she describes generally as "long, medium, and short curl patterns" with a depth of "deep, average, and shallow" is not a discovery unique to the Plaintiff. The totality of the evidence showed that Plaintiff's groupings for texture, curl, and stiffness do not deviate from the common experience. Mrs. Hale admitted on cross-examination that other hair care companies analyze and teach the curl and texture of hair. Moreover, in California Board, the Court understood Plaintiff to disavow "knowledge of the physical and chemical structure of hair and anatomy . . . ." (No. 97-CV-138, Doc. No. 108.) According to Plaintiff herself, natural hair care practices and techniques have evolved over thousands of years. To quote the Ninth Circuit in Satava, "[t]hese ideas, first expressed by nature, are the common heritage of humankind, and no artist may use copyright law to prevent others from depicting them." 323 F.3d at 813.

Finally, the Court finds that Plaintiff has not made an original expressive contribution to the portion of her program that deals with shampooing. Like combing, parting, and sectioning, shampooing is an experience shared by all individuals. Special shampooing techniques may be required to safeguard locked hair, but based on the evidence at trial, the Court concludes that new shampooing techniques have not been introduced by Sisterlocks. Defendant's Exhibit A contains almost forty photographs of locks on various individuals ranging from the Massai tribesman in Africa to African-American television stars. Certainly, with the prevalence of locks throughout African history and culture, the evidence does not support Plaintiff's claim of original expression. To the contrary, in the California Board case, Dr. Cornwell disavowed shampooing her clients, and represented that the sale of shampoo was primarily a marketing consideration entirely separate from her locking activities. (97-CV-138, Doc. # 136 at 10, n. 18.)

////

////

Setting aside the originality of Plaintiff's contribution, Plaintiff could not allege substantial similarity with respect to this section because Nappylocs and Sisterlocks recommend different shampooing techniques. Nappylocs suggests that locks be "twist[ed]. . . together" to protect during the first few shampoos (Def. Ex. EE at 30), whereas Sisterlocks recommends braiding and then banding the locks together. Sisterlocks advises that shampoo be placed in each individual bundle, and that each bundle be washed one at a time. Nappylocs, on the other hand, recommends only that the scalp be washed first and then the lather extended to the locks. (Def. Ex. EE at 30.) Both programs make the common-sense recommendation of separating the locks after washing. The Court concludes from the evidence presented that the techniques are not substantially similar.

The Court turns now to the portions of the Sisterlocks materials that contain a greater portion of protected expression. The Court begins with the lessons on locking and the locking patterns. Both programs teach techniques of locking hair by looping it through itself at various points around a circle. Dr. Cornwell's locks are starting by tying a knot and then using the fingers to lock the hair. Dr. Cornwell teaches four Sisterlocks looping patterns: a four pattern, a three pattern, a double three pattern, and a reverse four pattern. Each pattern moves around some combination of four points on a clock: twelve o'clock, three o'clock, six o'clock, and nine o'clock. When the lock nears completion, a tool may be used to weave the hair close to the scalp.

Nappylocs starts locks using a knot as well, but recommends use of its tool--a wire instrument that differs in appearance from the Sisterlocks tools--throughout the locking process, although locks can also be started using fingers. The use of the Nappylocs tool enables locks to be "sewn" into the hair. (Def. Ex. EE at 15.) Defendant also employs a circular pattern, but uses as her reference points all eight directions on a compass. Ms. Belton's first pattern is an eight-point pattern with eight total insertions beginning at the North and ending at the Northeast (Id. at 16-18.)

Nappylocs also presents a six-, four-, and two-point pattern for locking.

////

Nappylocs' four-point pattern, with insertion points at North, West, South, and East, is essentially identical to the four-point Sisterlocks pattern. In her book, Defendant's description of the four-point pattern is as follows. "4 pt pattern. The 4 pt pattern insertion points are North, West, South, and East." That sentence is accompanied by two close-up photographs of locked hair in the 4 point pattern, and an image of a compass.

With a factual work like the Sisterlocks materials, the question is not whether the Defendant employs the same ideas, but whether she expresses those ideas in a closely similar fashion. With respect to this item, Defendant's expression of the 4 point pattern is substantially identical to the Plaintiff's. Defendant admitted that she had limited locking experience of about one year when she took the Sisterlocks course. As part of that course, Defendant had access to the Plaintiff's copyrighted materials depicting the four-point pattern. See Metcalf v. Bochoco, 294 F.3d 1069, 1075 (9th Cir. 2002). The evidence at trial showed that Plaintiff's specific four-point pattern was not well known to Defendant at the time Defendant took the class. Considering Defendant's undisputed access to the training materials coupled with the substantial similarity of these elements, the Court concludes that copying of this limited portion has occurred. See Three Boys Music Corp. v. Bolton, 212 F.3d 477, 485-86 (9th Cir. 2000). This conclusion of copying does not extend to Nappylocs' other patterns–the six-point, the eight-point and the two-point patterns. These patterns reflect Defendant's own ingenuity and creative expression.

There are other elements of Nappylocs' description of the locking process that Plaintiff alleges are misappropriated from the Sisterlocks' training materials. For example, both Nappylocs and Sisterlocks instruct the user to perform his or her insertion "at the base of the lock." This idea is not encompassed within Plaintiff's copyright protection and did not originate with Plaintiff. The "Topsy Tail" tool also loops a ponytail's tip through its base at the scalp. (Def. Ex. P.) Logically, the best

location to loop hair is close to the root because it achieves a clean and complete division. If hair is looped through the end of the lock, for example, there may not be a complete separation and the hair may tangle. Ms. Belton is entitled to express the idea of looping the hair through the base of the lock for best results. That Defendant's expression of this idea paraphrases the Plaintiff's is a consequence of the need to communicate certain basic facts, not Defendant's copying. See Landsberg, 736 F.2d at 488 (explaining that "[subsequent authors wishing to express the ideas contained in a factual work often can choose from only a narrow range of expression").

Similarly, both Plaintiff and Defendant emphasize maintaining tension in the lock. Although Nappylocs uses a tool and Sisterlocks uses fingers, both systems slide each new loop towards the end of the hair to tighten it against the developing lock. Again, this process is necessary to effective locking. The evidence at trial showed that if tension is not maintained, the lock would be loose and may fall out. Because tension is an principle or concept essential for the placement of locks in the hair, Defendant is entitled to recite that idea in her book. 17 U.S.C. § 102(b).

Both materials also address what to do when a "Y" forms at the base of the lock. In Lesson 7, Sisterlocks addresses this problem during retightening, and suggests that the lock be bisected at the root from the side of the "Y" through. Sisterlocks calls his "looping in the cross-direction." Similarly, on page 21 of the Nappylocs book, the Defendant discusses "bisecting" the lock during retightening to correct this problem. Again, although the materials present the same basic idea, Defendant uses her own photographs and her own phrasing to communicate the idea. She does not plagiarize Plaintiff's expression. (Pl. Ex. 22.)

The Court has considered the two sets of materials from an objective perspective and has found that they are not substantially similar, with the exception of sizing guide graphic and the photographs and text describing the four-point pattern, where the Court does find substantial similarity. Cavalier v. Random House, Inc., 297 F.3d 815, 825 (9th Cir. 2001) (explaining that while the works "taken as a whole, do not infringe the [Plaintiff's] copyright, the question remains whether protected parts of the [Plaintiff's]

works have been copied"). The Court now turns to the intrinsic test for copyright infringement. See Krofft, 562 F.2d at 1163.

C. Intrinsic (Subjective) Test for Copyright Infringement

As the finder of fact, the Court is also called upon to make a subjective determination of whether the ordinary reasonable person would find the Nappylocs book to be substantially similar to the Sisterlocks videos and workbooks. Krofft, 562 F.2d at 1164. The Court concludes that, other than the four-point pattern and the graphic for the sizing guide, a reasonable person would not find the expressive content of these two works to be substantially similar. Although both the Nappylocs book and the Sisterlocks materials concern the same basic subject matter–locking the hair–the Court concludes from the totality of the evidence that the Nappylocs book is not simply a knock-off of the Sisterlocks method. The presentation, content, and target audience of these materials are sufficiently different such that a reasonable person would not conclude that Nappylocs had simply knocked off Sisterlocks. Cavalier, 297 F.3d at 822-823.

The Sisterlocks workbooks are targeted towards individuals who plan to do Sisterlocks as a business, and includes lessons on "how to market your business" and "your business relationship with SISTERLOCKS." (Pl. Ex. 39 at 3.) The introduction to the workbook states that "By becoming trained in the SISTERLOCKS system, you will have the chance to play a very important role in furthering the revolution in natural hair care that is taking place around the country. You will be helping to change the way women with naturally-textured hair relate to its unique beauty." (Id.) The Nappylocs book, on the other hand, is geared towards a person who wants to lock his or her own hair. Defendant's opening paragraph defines her target audience: "Do you admire dreadlocks but are unsure about how to start them? Have you tried to start dreadlocks and became frustrated because you weren't able to wash them as often or as fully as you liked? Did your locks unravel? Do you hate the sticky, gummy, waxy preparations designed to hold them in place until they lock? Can you get excited about a way to maintain your existing locks that does not involve twisting? Do you want a

more manicured lock?" (Def. Ex. EE.) Defendant purports to provide a simple, do-it-

////

yourself solution. Thus, although both books concern hair locking, they are crafted to attract different audiences.

These differences in the intended readership are reflected in the disparate depth of treatment and subject matter of each program provides. Importantly, both authors cover topics that the other does not. For example, Nappylocs contains advice on locking the hair of non-African-American individuals. (Def. Ex. EE at 38-41.) Nappylocs instructs on starting locks with braids or using products such as wax or glue to start or secure the locks. (Id. at 27.) Nappylocs also recommends methods for protecting the locks while sleeping, as well as tips for decorating, styling, and coloring locks. (Id. at 32-33.) On the other hand, Sisterlocks addresses many topics that Nappylocs does not discuss. For example, in the advanced Sisterlocks workbook, Dr. Cornwell discusses in detail the Sisterlocks consultation and marketing techniques. (Pl. Ex. 8 at 27-36.) Sisterlocks also provides detailed guidance on re-tightening and remedy techniques, and troubleshooting. (Id. at 5-27.)

What is most striking in a comparison of the Sisterlocks workbooks and videotapes to the Nappylocs book is the enormous differences in the depth of treatment of each topic. Sisterlocks is a far more comprehensive program than Nappylocs. Sisterlocks addresses topics in considerable detail that Nappylocs describes in just a few words. For example, Sisterlocks analyzes hair type in terms of curl length, curl depth, hair cuticle, and stiffness and pliability of the hair shaft. Nappylocs, on the other hand, devotes only a few paragraphs to the topic, discussing curl types in readily understandable terms like "springy" coils that "snap[] back when stretched" and "loose waves to bone straight." (Def. EE at 1.) As another example, the Sisterlocks program emphasizes and expands on the importance of tension throughout many of the Sisterlocks lessons, providing demonstrations of appropriate tension and helpful finger positions. Nappylocs refers to tension in only a few sentences very generally; for example, p. 21 states "Keep tension levels consistent[.]" (Id. at 18-21.) This disparity

in the depth of treatment of some topics is a consequence of contrasting length of the materials. Nappylocs' book is only forty pages long, many of which are filled with pictures and little text. Sisterlocks, on the other hand, has two workbooks and nine video lessons that are presented over a three-day period.

All of these points of dissimilarity are reflected in differences in price. One paying $22.95 for a do-it-yourself book and tool would expect only cursory treatment of many aspects of the locking process, whereas one paying $995 and attending a three-day course would expect to have mastered the skill at the conclusion of the workshop. Although the Nappylocs and Sisterlocks materials cover some of the same general topics, the strikingly different depth of treatment in those topics is one factor that precludes substantial similarity. That two works consider similar subject matter will not give rise to infringement; the works must have substantial similarity in both presentation and stylistic elements. See Rice, 330 F.3d at 1175-76 (holding that the "mere fact that both works feature" the same character, a masked magician, "revealing magic tricks cannot constitute copyright infringement").

Where Sisterlocks and Nappylocs do overlap--on topics like African hair texture, parting and sectioning, and shampooing--the information each presents is already publicly known. Based on the testimony of Ms. Belton, Mrs. Hale, and Ms. Edmonds, the Court concludes that it is likely that the audience for either product would already understand how to part and section their hair. Therefore, that audience would not perceive Sisterlocks and Nappylocs to share anything but the same, public ideas on that topic.

The Sisterlocks and Nappylocs materials also differ substantially in presentation. The Nappylocs book contain extensive writing and is composed around numerous pictures, whereas the Sisterlocks workbooks contain no graphics and are written in brief, outline form. The Nappylocs pictures are also dissimilar to the Sisterlocks video clips. Nappylocs uses photographs of various models to show the techniques. While the Sisterlocks videos feature some models, the primary focus is on Dr. Cornwell, who demonstrates the majority of the techniques on yarn on a practice board and on a

mannequin head. The videos contemplate that individual instruction in the classroom will occur following each video lesson. Finally, the Nappylocs book tells several personal stories of individuals who have been styled in Nappylocs. The Nappylocs book also contains room for the purchaser to compose his or her own journal. Sisterlocks employs neither of these devices in its video presentation. (Pl. Ex. 9A-9C.)

Taken together, although the Nappylocs books have some extrinsic similarities to the Sisterlocks materials, the Court concludes, as the finder of fact, that the reasonable person would not find overall substantial similarity between the products, other than the graphic depicting parting size and the graphics and text depicting the four-point pattern.

D. <u>Unclean Hands</u>

At trial, Ms. Belton defended against Plaintiff's claim of copyright infringement by alleging that Plaintiff could not enforce her copyright because of her own unclean hands. Ms. Belton referenced Plaintiff's unauthorized use in her book of several copyrighted images owned by a third party, the Hair Factory. (Def. Ex. Y.) Defendant credibly testified to the authenticity of Defendant's Exhibit Y, a letter from the Hair Factory to the Defendant confirming its copyright protection over the images allegedly used by Dr. Cornwell, and the Court admitted the letter in evidence. Fed. R. Evid. 807.

Dr. Cornwell did not dispute that the images were included in her publications. Instead, she claims that she was not aware that she had included, without permission, copyrighted images in her materials until Defendant brought it to her attention during this litigation. Plaintiff testified that the pictures were given to her at the time she was preparing her book and thought they were information within the public domain. According to Plaintiff, she did not consider the possibility that those images might be copyrighted. Dr. Cornwell has been a Professor of French and Africana Studies at San Diego State University, a major university, for twenty-one years. When questioned about her university's specific copyright policy, Dr. Cornwell professed lack of knowledge. Whether Dr. Cornwell is familiar with the precise content of the San Diego State employee handbook is not the point. Copyright protection, and a corresponding

prohibition of plagiarism, are axiomatic values within academia, Dr. Cornwell's field. Having worked a university professor for twenty-one years, the Court concludes that it is more likely than not that Dr. Cornwell understood that permission would be required before she could use another's graphics in her own book.

Nevertheless, there is insufficient evidence of intentional wrongdoing for the Court to decline to enforce the entirety Plaintiff's copyright based on her inclusion of the alleged Hair Factory graphics. The Court will, however, consider this fact as part of its equitable fashioning of an appropriate remedy in this case. Just as Plaintiff's copyright misstep will not bar enforcement of her copyrights, Defendant's use of the sizing guide graphic and the four-point pattern description in her Nappylocs books will not cause the Court to enjoin an appropriately modified Nappylocs book. In addition, the Court concludes that Defendant's Nappylocs webpage does not infringe Plaintiff's copyright and enters judgment in favor of Defendant on that claim. Therefore, the Court enters judgment on the copyright claims in part in favor of Plaintiff, and in part in favor of Defendant.

E. <u>Injunction</u>

In line with its conclusion that certain items in Defendant's book are copied from Plaintiff's materials, in a related order, the Court issues an injunction that directs Plaintiff to remove (1) the graphic showing the various block sizes presently shown on page 7 of her 2004 book and page 8 of her 2002 book; and (2) the description and pictures of the four-point pattern presently depicted on page 20 of the 2004 book and page 18 of the 2002 book. Given the impracticality of a recall and equitable considerations, the Court declines to recall the Nappylocs books that Defendant has already sold that contain the infringing material. However, Defendant must remove the infringing material from printed books that she has not yet sold and certify to the Court these corrective measures no later than September 15, 2005. After Defendant makes these modifications, she may continue to sell her revised Nappylocs' books.

F. <u>Damages and Attorney's Fees</u>

At trial, Plaintiff's counsel represented that the primary relief sought by Plaintiff

was an injunction, not monetary damages. For this strategic reason, Plaintiff did not elect to seek statutory damages, as is required by statute. 17 U.S.C. § 504(c). Under section 504, Plaintiff may pursue only her actual damages and any additional profits of Ms. Belton derived from the limited portion of the work the Court has found to be infringing. Id. § 504(a).

To recover actual damages, "a plaintiff in a copyright infringement action must establish a sufficient causal connection between the infringement and the infringer's profits it seeks to recover." Polar Bear Prods., Inc. v. Timex Corp., 384 F.3d 700, 703 (9th Cir. 2004). A court can decline to make a monetary award of damages or lost profits are too speculative. Id. at 710. Mackie v. Rieser, 296 F.3d 909, 914 (stating that "[i]n a copyright action, a trial court is entitled to reject a proffered measure of damages if it is too speculative" (quoting Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc., 772 F.2d 505, 517 (9th Cir. 1985)). The burden is on the copyright claimant to "first show a causal nexus between the infringement and the gross revenue." Polar Bear Prods., 384 F.3d at 711. If plaintiff fulfills this initial requirement, the burden shifts to the infringer to "apportion[] the profits that were not the result of infringement." Id.

Based on the evidence presented at trial, the Court concludes that Plaintiff has not shown a sufficient causal connection between the infringing conduct and the infringer's alleged profits. Mackie, 296 F.3d at 914. No damages expert testified as part of this case. While Ms. Belton testified that her total revenue for the Nappy and Happy business over the last year was approximately $7,500, this figure includes hair products, styling, and hair jewelry. According to Plaintiff's Exhibit 40, there are over thirty-five Nappy and Happy hair jewelry items that sell for prices ranging from $8.00 up to $125.00. (Pl. Ex. 40.) Nappy and Happy also sells a variety of shampoos and bodywashes, body cremes, and body oils for prices ranging from $5.00 up to $16.00. (Id.) The Nappylocs self-published book retails for $22.95. (Id.) Based on its evaluation of the evidence presented at trial, the Court concludes that a sufficient causal connection between the two infringing items in the Nappylocs book and Ms.

Belton's Nappy and Happy profits has not been shown. Polar Bear Prods., 384 F.3d
////
at 711. Weighing the totality of the evidence presented at trial, the Court declines to award lost profits. Mackie, 296 F.3d at 914.

Similarly, Plaintiff did not show a causal connection between Defendant's infringing conduct and Plaintiff's actual losses, if any. Id. Plaintiff did not submit into evidence any documentation of Sisterlocks' revenue or Dr. Cornwell's income for the years in question. Dr. Cornwell testified generally to approximate revenue and income, but did not testify that any alleged losses were the direct consequence of Defendant's infringement. Also significant is Defendant's testimony that her Nappy and Happy revenue has only been between $4,000 and $7,500 annually over the last few years. Considering the totality of the evidence, the Court declines to award actual losses in this case because that amount would be too speculative. Mackie, 296 F.3d at 914.

Finally, the Court declines to award attorneys' fees or costs to either party. Under section 505 the Court "in its discretion may allow the recovery of full costs by or against any party other than the United States or an officer thereof. . . . [T]he court may also award a reasonable attorney's fee to the prevailing party as part of the costs." 17 U.S.C. § 505. The award of attorney's fees is within this Court's "sound discretion." Fantasy, Inc. v. Fogerty, 94 F.3d 553, 555 (9th Cir. 1996). Weighing the totality of the evidence presented on the copyright claims, the Court exercises its discretion to decline to award attorney's fees. 17 U.S.C. § 505.

## Conclusion

The Court enters judgment in favor of Defendant on the claims of trademark and trade dress infringement; violations of the Uniform Trade Secret Act; unfair competition; and interference with economic advantage. On the copyright claim, the Court enters judgment in part in favor of Defendant and in part in favor of the Plaintiff. By separate order, the Court issues an injunction directing Defendant to remove (1) the graphic showing the various block sizes presently shown on page 7 of her 2004 book and page 8 of her 2002 book; and (2) the description and pictures of the four-point

pattern presently depicted on page 20 of the 2004 book and page 18 of the 2002 book.

////

The Court also declines to award costs to either party as each party prevailed on certain claims and did not prevail on others.

The Court compliments the parties on their excellent presentation of this interesting case. Counsel and Ms. Belton, a *pro se* litigant, were well prepared, thorough, and articulate. The Court commends counsel and Ms. Belton for their mastery of both the factual record and the legal issues, and thanks both parties for their professional presentation of this case.

IT IS SO ORDERED.

DATED: 9-6-05

Marilyn L. Huff

MARILYN L. HUFF, District Judge
UNITED STATES DISTRICT COURT

Copies to:

Gregory M. Garrison
Garrison & McInnis, LLP
2650 Camino del Rio North, Suite 108
San Diego, California 92008

Debra Belton
15183 Chamisal Drive
Chesterfield, MO 63017